**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|                          | * |                          |
| ------------------------ | - | ------------------------ |
| **RONALD H. POSYTON, III,** | * |                          |
| **Plaintiff,**           | * |                          |
| **v.**                   | * | **Case No.: PWG-16-3887** |
| **MARYLAND,** *et al.*,   | * |                          |
| **Defendants.**          | * |                          |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Ronald Posyton, III enrolled at the University of Maryland, College Park for about a month in 2015, where he lived in a dormitory. During that time, University of Maryland Police Department ("UMPD") officers came to his dorm room twice, once entering briefly and the second time asking him to accompany them to the station, where they questioned him for three and a half hours. Upset by these interactions, Posyton withdrew from the university and filed suit against the police officers ("Individual Defendants") in their individual and official capacities, as well as the State of Maryland.

Pending is Defendants' Motion to Dismiss Plaintiff's Complaint with Prejudice and/or for Summary Judgment, ECF No. 33. Because, as Posyton concedes, he cannot state a claim under 42 U.S.C. § 1983 against the State, those claims will be dismissed. And, because the Individual Defendants are immune to suit in their individual capacities with regard to Posyton's state constitutional tort claims, I will dismiss those claims as well. Defendants fail to establish Eleventh Amendment or qualified immunity, however, and Posyton has stated claims against the Individual Defendants in their individual capacities under § 1983 and Maryland under state law.

Therefore, this case will proceed to discovery with regard to those claims, and I will appoint pro bono counsel for Posyton, for the limited purpose of advising him throughout the discovery period, without entering an appearance or representing him in this case.

**Background**

Posyton transferred to the University of Maryland, College Park ("UMCP") at the beginning of fall semester 2015, and he lived in a dormitory. Second Am. Compl. ¶¶ 16–22, ECF No. 26; Pl.'s Aff. to Clarify ¶ 1, ECF No. 32.[1] Late on September 19, 2015, he "snorted his prescription medications (one 10mg Adderall pill) in the vantage-point of his roommate," who "asked Mr. Posyton 'to either stop snorting the substance or leave the room because it [was] not allowed in the residence halls.'" Pl.'s Aff. to Clarify ¶ 2. Posyton left the room, and his roommate reported his actions to the "RA" (Residential Advisor); another RA called the University of Maryland Police Department ("UMPD"). *Id.* ¶¶ 2–3. UMPD officers went to Posyton's dorm room but, because he was not there, they asked the RA "to contact UMPD when Mr. Posyton was located." *Id.* ¶ 4. At about 12:30 p.m. on September 20, 2015, the RA learned that Posyton was in his dorm room, asleep, and she called UMPD. *Id.* ¶¶ 6–7.

Five UMPD officers responded to her call. *Id.* ¶ 7; Second Am. Compl. ¶¶ 16–22.[2] They knocked on Posyton's room door, waking him. Second Am. Compl. ¶ 23. He opened the door and "backed away slowly, and sat down in a chair." *Id.* ¶ 25. After speaking briefly with Posyton while standing in the hallway, Officer Brian Naecker asked if he and the other officers

---

[1] Plaintiff's Second Amended Complaint and Affidavit to Clarify are verified.

[2] In his pleading, Posyton alleges that the officers were investigating an incident that occurred two days earlier, in which "an unknown person had made brief contact with [UMCP student] GAREY's 'leg.'" Second Am. Compl. ¶¶ 16–22.

(John Doe 1, John Doe 3, and Jane Doe 4) could enter; "[i]n response to NAECKER's request, MR. POSYTON unequivocally did absolutely nothing." *Id.* Naecker took two steps into the room, Posyton "yelled, 'No!'" and Nacker left the room, continuing his conversation from the hallway. *Id.* ¶¶ 26–29.

Posyton claims that Doe 4 "reminded [him] to take his prescription medications," he went to his bathroom to do so, and invited Naecker to accompany him. Second Am. Compl. ¶¶ 30–31, 33; Pl.'s Aff. to Clarify ¶ 18. Naecker "walk[ed] over to Mr. Posyton's bed and start[ed] looking around,"[3] instead of accompanying him to the bathroom. Pl.'s Aff. to Clarify ¶ 19. When Posyton returned, he saw Doe 1 standing five feet inside his room; Does 3 and 4 failed to stop Doe 1 from entering. Second Am. Compl. ¶¶ 30–31, 33. Ultimately, the officers "decided to vacate the premises"; Posyton asserts that he "never felt free to terminate the encounter." *Id.* ¶ 32.

On September 23, 2015, Officers William Mable, Michael Thomas and John Doe 2 went to Posyton's dorm room. Second Am. Compl. ¶¶ 38, 40. The officers had their weapons, but not their body cameras with them. *Id.* ¶¶ 40, 43. When Posyton opened the door, Mable said, "We'd like you to come down to the station for questioning." *Id.* ¶ 44. Posyton agreed to go and invited the officers in, although as he sees it, he "believed that MABLE was getting prepared to imminently pull him from his home," and "MR. POSYTON would have been chastised by UMCP's *Code of Conduct* if he had refused." *Id.* ¶¶ 48–49. Additionally, he "believed that he had no choice other than to travel to 'the station,'" and because the officers were not in uniform,

---

[3] Posyton clarifies that his claim against Naecker does not pertain to his actions after he was invited into the room; "[t]he entire action about Naecker is him taking two steps into the structure of Mr. Posyton's home without jurstification, and then exiting." Pl.'s Aff. to Clarify ¶ 24.

"during brief moments, he believed that he was being kidnapped." *Id.* ¶ 54. Posyton asked to be questioned in his dorm room, but Mable simply repeated that they wanted him to go to the police station. *Id.* ¶¶ 47, 53. Thomas showed Posyton his badge on the way to the officers' unmarked car. *Id.* ¶ 55. Thomas and Doe 2 ordered Posyton to sit in the front seat, which Posyton perceived as an "attempt[] to cover-up [his] seizure." *Id.*

At the police station, the officers brought Posyton to a room, which they "covertly video record[ed]," and where they took a photograph of him. Second Am. Compl. ¶¶ 56–57. Posyton states that he "was never told that he was free to leave," and he informed the officers that he was "really scared" and concerned that "he would be expelled from UMCP's program" for being at the station. *Id.* ¶¶ 61–63. He claims that "MABLE and THOMAS implied that they would not enlighten UMCP of MR. POSYTON's situation if he cooperated, which effectively induced MR. POSYTON into expressing every cognizable act of possible wrongdoing." *Id.* ¶ 65. Within less than two minutes, "MR. POSYTON . . . confess[ed] to every offense that he ever committed," including that "he made brief contact with an unknown person on their 'shin.'" *Id.* ¶¶ 66–67. He provided a statement. *Id.* ¶¶ 69–72.

Posyton then admitted "to having said something sexual to GAREY," after having "previously denied [it] approximately 14 times"; he claims that Thomas "coerce[d] him" and said he would not "get in trouble." *Id.* ¶ 72. When Posyton asked if he could open the door, "THOMAS chuckled and left THE ROOM." *Id.* ¶ 70. He was "released" after three and a half hours. *Id.* ¶ 75. He claims that this was a "false confession" and that he would not have been "released . . . if he had not provided a confession." *Id.* According to Posyton, "MABLE's and THOMAS's primary objective was to capture MR. POSYTON's photograph" while he was at

the station. *Id.* ¶ 76. Mable included Posyton's photograph in a photo line-up shown to Garey, who identified Posyton as the one involved in the September 18, 2015 incident. *Id.* ¶¶ 77–78.

Two days later, on September 25, 2015, Posyton was charged with underage possession of alcohol; the charge was *nolle prosequi*. Second Am. Compl. ¶ 80. He claims that the officer who charged him, James Runuldue,[4] "drove off with [his] UMCP identification card." *Id.* The same day, Posyton withdrew from UMCP because he "was afraid that UMPD officers would return to his home." *Id.* ¶ 79.

On September 26, 2015, Posyton was charged with second degree assault; he claims that the charge was based on Mable's warrant application, which provided that "Posyton stated" that he asked to kiss Garey, when Posyton actually wrote that he "maybe, probably" asked to kiss her. *Id.* ¶¶ 73–74, 81, 84. Posyton contacted UMPD about the charges a few days later, but Mable refused to speak with him, and Deanna Renner, who did speak with him, refused to provide the police report and threatened to charge him with assault and harassment if he contacted UMPD again. *Id.* ¶¶ 86–87. He asserts that he was not properly served with process in his criminal case. *Id.* ¶¶ 88–89. His criminal trial was scheduled for December 12, 2015 but had to be rescheduled when Garey and Mable did not appear, "thereby, depriving MR. POSYTON of the right to a speedy trial." *Id.* ¶ 91. The case was placed on the *stet* docket. *Id.* ¶ 92. Thereafter, "[o]n February 22, 2016, MR. POSYTON was involuntarily committed to a psychiatric hospital for the mentally insane due to the foregoing events." *Id.* ¶ 93.

Posyton filed suit on October 25, 2016 in the Circuit Court for Prince George's County, ECF No. 2, and Defendants removed to this Court on December 5, 2016, ECF No. 1. He sought

---

[4] Posyton misspells Runuldue's name as "Runaldue." *See* Am. Compl., ECF No. 24. The Clerk SHALL AMEND the docket to reflect the proper spelling, Runuldue, *see* ECF No. 27.

leave to file a "second" amended complaint, ECF No. 17, but, because no prior amendment appeared on the docket, I informed him that he could amend as a matter of course, Jan. 5, 2017 Ltr. Order, ECF No. 23. Posyton filed a document titled "Second Amended Complaint," which actually was his first amended complaint. ECF No. 24. Defendants filed a letter stating their intent to file a motion to dismiss and outlining the perceived deficiencies in the amended complaint. ECF No. 25. In response, Posyton filed a Second Amended Complaint (erroneously titled "Third Amended Complaint" but referred to in this Memorandum Opinion and Order as Second Amended Complaint). ECF No. 26; *see* Jan. 5, 2017 Ltr. Order (permitting Posyton to amend to address deficiencies that Defendants identified, after which Defendants could move to dismiss if they still believed the pleading failed to state a claim). He further amended his pleadings through Consent Motions to Dismiss Counts IV, VIII, IX, X and XI of the Second Amended Complaint and all claims against James Runuldue and Deanna Renner in their official and individual capacities, ECF Nos. 27, 29, which I approved, ECF Nos. 30, 31. Thus, the Second Amended Complaint, as amended by the Consent Motions to Dismiss, is the operative complaint.

Counts I, II, and III are claims under the Fourth Amendment (pursuant to § 1983) and Md. Const., Art. 26 against Naecker and Doe 1, Count I for invasion of privacy, Count II for unlawful entry, and Count III for unreasonable search. Posyton claims that when Naecker and Doe 1 entered his dorm room on September 20, 2015 "without a warrant, consent, notice probable cause, or exigency/safety concerns," and as a result gained "a better viewpoint," they violated his privacy rights and his rights not to have his premises entered or searched unlawfully. Second Am. Compl. ¶¶ 105, 111, 117–18. Count IV has been dismissed. Count V is a claim

under the Fourteenth Amendment (pursuant to § 1983) and Md. Const., Art. 24 against Does 3 and 4 for failure to intervene when Naecker and Doe 1 entered his dorm room. *Id.* ¶¶ 128–30.

Count VI is a claim under the Fourth Amendment (pursuant to § 1983) and Md. Const., Art. 26 against Mable, Thomas, and Doe 2 for unreasonable seizure based on the incident on September 23, 2015, when they asked him to go to the police station for questioning and he felt that "he had no choice but to travel to UMPD headquarters." *Id.* ¶ 140. Count VII is a claim under the Fourteenth Amendment (pursuant to § 1983) and Md. Const., Art. 24 against Mable, Thomas, and Doe 2 for unlawful custody, based on the time he spent in the interrogation room on September 23, 2015, during which he was not told he was free to leave and, in his view, "[n]o reasonable person would feel free to leave an interrogation room. . . ." *Id.* ¶¶ 149–50. Counts VIII, IX, X and XI have been dismissed. Under the heading "Epilogue," Posyton alleges that he has at least substantially complied with the Maryland Torts Claims Act and that none of the Defendants have immunity with regard to his claims. Second Am. Compl. 20.[5]

After Posyton filed the Second Amended Complaint, Defendants filed the pending Motion to Dismiss Plaintiff's Complaint with Prejudice and/or for Summary Judgment, ECF No. 33, which the parties fully briefed, ECF Nos. 33-1, 36, 38. Additionally, Posyton has filed a Motion for Leave to File Sur-Reply, ECF No. 39 (which Defendants opposed, ECF No. 41, and to which Posyton filed a reply, ECF No. 42), and a Motion for Leave to File a Supplement to Sur-Reply, ECG No. 40, both of which are pending. He also filed a letter request to file a motion

---

[5] Defendants argue for dismissal of the "Tort claim set forth in his 'Epilogue,'" Defs.' Mem. 7–9, but it is clear that Posyton does not seek to assert a tort claim in his Epilogue other than the constitutional tort claims he identifies in his pleading. *See* Second Am. Compl. 20; Pl.'s Opp'n 1 (asserting that he "does not allege any common law torts").

to file a third amended complaint that would add a *Monell*[6] claim, add facts, and "strike things that were already dismissed with prejudice." ECF No. 43. I denied his request, without prejudice to filing a motion to amend to state a *Monell* claim after the motion to dismiss is resolved. ECF No. 44. Finally, he filed a Motion for Leave to Clarify, ECF No. 46, which Defendants opposed, ECF No. 47, and which also is pending. Although Posyton's pleadings have not been a model of clarity, neither additional allegations nor additional briefing are likely to provide clarity; nor are they necessary to understand the nature of the claims in this case. Accordingly, Posyton's three pending motions to augment his filings are denied.

### **Standard of Review**

Federal Rule of Civil Procedure 12(b)(6) provides for "the dismissal of a complaint if it fails to state a claim upon which relief can be granted." *Velencia v. Drezhlo*, No. RDB-12-237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012). This rule's purpose "'is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Id.* (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)). To that end, the Court bears in mind the requirements of Fed. R. Civ. P. 8, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), when considering a motion to dismiss pursuant to Rule 12(b)(6). Specifically, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678–79; *see also Velencia*, 2012 WL 6562764, at *4 (discussing standard from *Iqbal* and *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content

---

[6] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

"Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense," such as qualified immunity. *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013) (quoting *Brockington v. Boykins,* 637 F.3d 503, 506 (4th Cir. 2011) (internal quotation marks omitted)). Thus, "[a] qualified immunity defense can be presented in a Rule 12(b)(6) motion, but, . . . when asserted at this early stage in the proceedings, 'the defense faces a formidable hurdle' " and "'is usually not successful.'" *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 396 (4th Cir. 2014) (quoting *Field Day, LLC v. Cty. of Suffolk,* 463 F.3d 167, 191–92 (2d Cir. 2006)).

Posyton is proceeding *pro se*, and his Complaint is to be construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972); however, liberal construction does not absolve Plaintiff from pleading plausible claims. *See Holsey v. Collins*, 90 F.R.D. 122, 128 (D. Md. 1981) (citing *Inmates v. Owens*, 561 F.2d 560, 562–63 (4th Cir. 1977)).

> It is neither unfair nor unreasonable to require a pleader to put his complaint in an intelligible, coherent, and manageable form, and his failure to do so may warrant dismissal. District courts are not required to be mind readers, or to conjure questions not squarely presented to them.

*Harris v. Angliker*, 955 F.2d 41, 1992 WL 21375, at * 1 (4th Cir. 1992) (per curiam) (internal citations omitted).

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.*

### Discussion

Posyton's claims fall into four categories, and I will address each category in turn: (1) his claims against "Defendant STATE OF MARYLAND ('UMCP')" and the Individual Defendants in their official capacities under § 1983, (2) his claims against "Defendant STATE OF MARYLAND ('UMCP')" and the Individual Defendants in their official capacities under the Maryland Declaration of Rights, (3) his claims against the Individual Defendants in their individual capacities under the Maryland Declaration of Rights, and (4) his claims against the Individual Defendants in their individual capacities under § 1983.

*Section 1983 Claims against the State*

Section 1983 provides a remedy for individuals who have been deprived of their constitutional rights under color of state law. *See* 42 U.S.C. § 1983 (2012); *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 707 (1999)). The statute states:

> Every person who, under color of any statute, ordinance, regulation, custom or usage of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "To state a claim under Section 1983, a plaintiff must allege that: 1) a right secured by the Constitution or laws of the United States was violated and 2) the alleged violation was committed by a person acting under the color of state law." *Peters v. City of Mount Rainier*, No. GJH-14-00955, 2016 WL 1239921, at *4 (D. Md. Mar. 24, 2016) (quoting *Brown v. Bailey*, 2012 WL 2188338, at *5 (D. Md. June 13, 2012)), *aff'd sub nom. Peters v. Caplan*, 672 F. App'x 327 (4th Cir. 2017); *see also West v. Atkins*, 487 U.S. 42, 48 (1988).

Posyton names the Individual Defendants in their individual and official capacities, as well as "Defendant, STATE OF MARYLAND ('UMCP')." Second Am. Compl. ¶¶ 4–14. He asserts that he is suing defendants in their "official capacity[ies] for equitable relief." *Id.* ¶ 94. Notably, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) (internal citations omitted). And, regardless of relief sought, a state is not "a 'person' within the meaning of 42 U.S.C. § 1983." *Kelly v. Bishop*, No. RDB-16-3668, 2017 WL 2506169, at *4 (D. Md. June 9, 2017) (citing *Will*, 491 U.S. at 64-65 & 70-71). Consequently, Posyton fails to state a claim under § 1983 against the Individual Defendants in their official capacity, UMCP, or the State. *See Will*, 491 U.S. at 64–65 & 70–71; *Kelly*, 2017 WL 2506169, at *4; *see also* Pl.'s Opp'n 33–34 (conceding that Defendants only can be sued in their individual capacities under § 1983). Accordingly, these claims are dismissed.

*State Constitutional Torts against the State*

Defendants insist that "Plaintiff's claims for damages against Defendants in their official capacities, are barred by sovereign immunity, under the 11th Amendment." Defs.' Mem. 6. They also argue that "Maryland law is clear that state actors are entitled to immunity from [state tort] claims, so long as they are acting within the scope of their employment and without malice or gross negligence." *Id.* at 7. Preliminarily, I note that state sovereign immunity and Eleventh Amendment immunity are separate concepts, as "the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment." *Stewart v. North Carolina*, 393 F.3d 484, 487 (4th Cir. 2005) (quoting *Alden v. Maine,* 527 U.S. 706, 713 (1999)). "State sovereign immunity is 'based on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends,'" whereas "by the terms of the Eleventh Amendment, an unconsenting state is immune from suit filed in federal court by a citizen of another state." *Id.* at 488 (quoting *Nevada v. Hall,* 440 U.S. 410, 416 (1979)); *see* U.S. Const. amend. XI.

Significantly, Posyton filed suit in state court, where, through the Maryland Tort Claims Act ("MTCA"), Md. Code Ann., State Gov't § 12-101 *et seq*., the State of Maryland has waived its sovereign immunity for certain types of cases *brought in state court*. *See* State Gov't § 12-104. Specifically, "[t]he MTCA allows a plaintiff to sue the State for intentional and constitutional torts, . . . where a state official acting in his/her official capacity in the performance of his/her duties, performed such duties without gross negligence or malice." *Runnels v. Newell*, 944 A.2d 1183, 1208 (Md. Ct. Spec. App. 2008) (citing State Gov't § 12-104), *aff'd in part, rev'd in part,* 407 Md. 578, 967 A.2d 729 (2009); *see also Litz v. Md. Dep't of Env't*, 131 A.3d 923, 937 (Md. 2016) ("'Section 12-104(a)(1) of the State Government Article

[after its 1985 amendment] provides that . . . [n]either intentional torts (in the absence of malice), nor torts based upon constitutional violations, are excluded.' Therefore, under this statute, as long as the intentional tort or constitutional violation was 'committed within the scope of state employment and without malice or gross negligence,' it is subject to the MTCA." (quoting *Lee v. Cline*, 863 A.2d 297, 303-04 (Md. 2004))), *reconsideration denied* (Mar. 24, 2016). Defendants then removed to this Court, where Maryland "has not waived its immunity under the Eleventh Amendment *to suit in federal court*." *McIntosh v. Div. of Corr.*, No. PWG-16-1320, 2017 WL 3412081, at *4 (D. Md. Aug. 7, 2017) (emphasis added). But, given that Plaintiff initiated suit in state court, Defendants now may assert immunity with regard to the state tort claims in federal court only insofar as they were immune to those claims in state court. *See Insalaco v. Anne Arundel Co. Pub. Schs.*, No. JKB-10-1392, 2011 WL 5838945, at *3 (D. Md. Nov. 18, 2011) (comparing *Lapides v. Bd. of Regents of the Univ. Sys. of Georgia,* 535 U.S. 613 (2002), and *Stewart v. North Carolina*, 393 F.3d 484, 487 (4th Cir. 2005), and noting that the defendant, an arm of the State, did not "waive[] its sovereign immunity against Plaintiff's state law claims brought in state court, such that as in *Stewart*, "Defendant retain[ed] its immunity despite removal of the case to federal court," whereas if the defendant had waived its immunity to suit in state court, as in *Lapides*, it could "not regain immunity simply by shifting the case to a federal forum").

Thus, analysis in this case begins with whether the State waived its immunity to suit in state court on the state constitutional claims against it. As noted, the MTCA provides a limited waiver of immunity to suit on state constitutional claims. *See* State Gov't § 12-104; *Litz*, 131 A.3d at 937; *Runnels*, 944 A.2d at 1208. To determine whether the State waived its immunity in this case, I must consider whether Defendants were acting within the scope of state employment

and whether they acted with malice or gross negligence.  It is undisputed that Defendants, police officers, acted within the scope of their employment.  Defs.' Mem. 7; *see also* Second Am. Compl.; Pl.'s Opp'n.

> In Maryland, malice is "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud..." *Lee v. Cline*, 863 A.2d 297, 311 (Md. 2004) (quoting *Shoemaker v. Smith*, 725 A.2d 549, 559 (Md. 1999) (internal quotation marks omitted). A state official thus must "actually and subjectively intend to do wrong or harm" to act with malice. *Marks v. Dann*, 600 Fed. Appx. 81, 86 (4th Cir. 2015). The official's conduct must be more than "merely reckless or wanton." *Id.* (quoting *Shoemaker*, 725 A.2d at 560).

*Taylor v. Somerset Cty. Comm'rs*, No. RDB-16-0336, 2016 WL 3906641, at *6 (D. Md. July 19, 2016).  "Plaintiffs face a high standard when pleading malice." *Id.* (quoting *McDaniel v. Maryland*, No. RDB-10-189, 2010 WL 3260007, at *8 (D. Md. Aug. 18, 2010)).

> At the motion to dismiss stage, "the mere assertion that an act 'was done maliciously, or without just cause, or illegally, ... or for improper motive' is not sufficient." *Manders v. Brown,* 101 Md.App. 191, 216 (1994) (quoting *Elliott v. Kupferman,* 58 Md.App. 510, 526 (1984)). Rather, to defeat immunity, "the plaintiff must allege with some clarity and precision those facts which make the act malicious." *Id.* (internal quotation marks omitted); *cf. Ostrzenski v. Seigel,* 3 F.Supp.2d 648, 653 (D.Md.1998) ("It is enough ... to allege that a defendant harbored hostility towards the plaintiff *and* caused the plaintiff harm.") (emphases added).

*Marks v. Dann*, No. DKC-13-0347, 2013 WL 8292331, at *10 (D. Md. July 24, 2013), *aff'd,* 600 F. App'x 81 (4th Cir. 2015)

> Gross negligence is "something *more* than simple negligence, and likely more akin to reckless conduct."  *Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007) (quoting *Taylor v. Harford Cty. Dep't of Soc. Servs.,* 862 A.2d 1026, 1035 (Md. 2004) (emphasis in original)). It is

> an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.

*Id.* (quoting *Liscombe v. Potomac Edison Co.,* 495 A.2d 838, 846 (Md. 1985)). "Ordinarily, unless the facts are so clear as to permit a conclusion as a matter of law, it is for the trier of fact to determine whether a defendant's negligent conduct amounts to gross negligence." *Taylor*, 862 A.2d at 1034 (quoting *Marriott Corp. v. Chesapeake & Potomac Tel. Co. of Md.,* 723 A.2d 454, 462 (Md. Ct. Spec. App. 1998)).

Posyton alleges that Naecker and Doe 1 briefly entered his dorm room while Does 3 and 4 failed to stop them, and that Thomas, Mable, and Doe 2 asked him to come down to the police station and questioned him for three and a half hours under circumstances in which he did not feel free to say no or to leave. He claims (in conclusory terms) that all Defendants "acted with intent, incompetency, or with a callous and reckless indifference for MR. POSYTON's federal and state constitutional protected rights." Second Am. Compl. ¶¶ 108, 113, 121, 131, 143, 153. He also alleges that, "[w]ithout due process of law, each *Defendant* acted with, *inter alia,* motive, intent, malice, incompetency, or gross negligence, and violated MR, POSYTON's clearly established rights, and are not shielded by immunity." *Id.* ¶ 184. But, even in the light most favorable to Posyton, the facts do not show that any of the Defendants intended to injure Plaintiff. And, he utterly fails to allege any facts that make any of Defendants' acts malicious or that show that any of the Defendants "harbored hostility toward the plaintiff." *See Marks*, 2013 WL 8292331, at *10 (quoting *Ostrzenski*, 3 F. Supp. 2d at 653). Consequently, these "[t]hreadbare recitals of the elements . . . , supported by mere conclusory statements, do not suffice" to allege malice. *See Iqbal*, 556 U.S. at 678–79; *Taylor*, 2016 WL 3906641, at *5 ("To defeat this immunity, a plaintiff must '*sufficiently* allege[ ]' that the state personnel acted with malice or gross negligence." (quoting *Barbre*, 935 A.2d at 714 (emphasis in original))); *Marks*, 2013 WL 8292331, at *10.

Moreover, even though gross negligence determinations typically are the jury's domain, *see Taylor*, 862 A.2d at 1034 here the facts in Posyton's verified filings, taken in the light most favorable to him, do not support a finding of gross negligence. Posyton simply has not alleged that any of the Defendants acted intentionally when engaging in actions that purportedly amount to constitutional violations. Nor has he alleged that Defendants failed to make any effort to avoid purportedly violating his state and federal constitutional rights. On the contrary, he states that Naecker asked if he could enter Posyton's dorm room, paused before entering, and exited immediately when Posyton said no; and Doe 1 did not enter until Posyton gave consent, notwithstanding the fact that the consent may have been directed at Naecker alone. As for Does 3 and 4, their alleged failures to act were fleeting, as Naecker and Doe 1 quickly exited Posyton's room. And, Mable, Thomas and Doe 2 wore plainclothes, asked Posyton to go to the station rather than demanding that he accompany them, and did not come into contact with him when they approached him. Additionally, they did not tell him he could not leave the interrogation room, and they concluded the interview within three and a half hours. All of these facts show that Defendants made an effort to comply with Posyton's constitutional rights. None of them demonstrate that Defendants "inflict[ed] injury intentionally or [were] so utterly indifferent to [Posyton's] rights . . . that [they] act[ed] as if such rights did not exist." *See Barbre*, 935 A.2d at 717. Thus, as a matter of law, Defendants were not grossly negligent. *See id.* Accordingly, the State waived its immunity from suit in state court as to Posyton's state constitutional claims, *see Lapides,* 535 U.S. 613; *Insalaco*, 2011 WL 5838945, at *3. Therefore, as in *Lapides*, the State could "not regain immunity simply by shifting the case to a federal forum." *See Insalaco*, 2011 WL 5838945, at *3. Consequently, neither sovereign immunity nor

Eleventh Amendment immunity provides a basis for dismissal of the state constitutional tort claims against the State.[7]  *See id.*

I note, however, that "[t]he liability of the State and its units may not exceed $400,000 to a single claimant for injuries arising from a single incident or occurrence."  State Gov't § 12-104(a)(2).  Posyton alleges two incidents: (1) Naecker and Doe 1's entry into his dorm room on September 20, 2015, and Does 3 and 4's failure to intervene, and (2) Thomas, Mable, and Doe 2's purported seizure and custody of him on September 23, 2015.  The State's liability for each of these incidents (if proved) is capped at $400,000.  *See id.*

*State Constitutional Torts against the Individual Defendants in their Individual Capacities*

As for the state constitutional tort claims against Defendants in their individual capacities, the MTCA provides that state personnel like Defendants[8] "are immune from liability [in a Maryland state court] if the challenged act or omission falls "within the scope of the public duties of the State personnel *and* is made without malice or gross negligence."  *Runnels*, 944 A.2d at 1208; Md. Code Ann., Cts. & Jud. Proc. § 5-522(b) ("State personnel, as defined in § 12-

---

[7] The question remains whether Posyton stated a claim against the State under Article 24 or Article 26.  Article 24 is read *in pari materia* with the Fourteenth Amendment.  *See Schloss v. Lewis*, No. JFM-15-1938, 2016 WL 1451246, at *10 (D. Md. Apr. 12, 2016) (citing *Barnes v. Montgomery Cty., Md.*, 798 F. Supp. 2d 688, 700 (D. Md. 2011)), *aff'd sub nom. Schloss v. Abey*, No. 16-2217, 2017 WL 2465020 (4th Cir. June 7, 2017).  Likewise, "Article 26 protects the same rights as those protected under the Fourth Amendment to the United States Constitution," and "Maryland courts 'have long recognized that Article 26 is *in pari materia* with the Fourth Amendment.'"  *Ross v. Early*, 899 F. Supp. 2d 415, 431 (D. Md. 2012) (quoting *Dent v. Montgomery Cty. Police Dept.*, 745 F. Supp. 2d 648, 661 (D. Md. 2010); citing *Barnes*, 798 F. Supp. 2d at 700); *see also Richardson v. McGriff*, 762 A.2d 48, 56–57 (Md. 2000). Therefore, I will consider the sufficiency of Posyton's state constitutional tort claims when I address his § 1983 claims, below.  *See Schloss*, 2016 WL 1451246, at *10; *Ross*, 899 F. Supp. 2d at 431.

[8] *See* State Gov't 12-101(a)(1) (defining state personnel to include state officials); *Housley v. Holquist,* 879 F. Supp. 2d 472, 483 (D. Md. 2011), (treating county police officers as state personnel for purposes of MTCA).

101 of the State Government Article, are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and for which the State or its units have waived immunity under Title 12, subtitle 1 of the State Government Article, even if the damages exceed the limits of that waiver."); *Marks v. Dann*, No. DKC 13-0347, 2013 WL 8292331, at *7 (D. Md. July 24, 2013) ("The Court of Appeals of Maryland has observed that, when read in tandem, these provisions establish that the tort 'liability of the State and [the tort] liability of individual State personnel are mutually exclusive. If the State is liable, the individual is immune; if the individual is liable, the State is immune.'" (quoting *Newell v. Runnels,* 967 A.2d 729, 763 (Md. 2009)), *aff'd,* 600 F. App'x 81 (4th Cir. 2015). Having found that Defendants' alleged acts fall within the scope of their employment and were made without malice or gross negligence, I find that the MTCA barred the claims against them individually in state court."[A]ny immunities that . . . Defendants may claim in Maryland state court travel with them to federal court. *Carter v. Maryland*, No. JKB-12-1789, 2012 WL 6021370, at *4 (D. Md. Dec. 3, 2012) (considering claims against State as well as defendants sued in the individual capacities and noting that, after removal, "state personnel immunity may potentially apply" to defendants sued in their individual capacities; citing *Stewart*, 393 F.3d at 490). Thus, Defendants retain their statutory immunity to the claims against them in their individual capacities, even though they removed this case to federal court. Therefore, the state constitutional claims against Defendants in their individual capacities are dismissed.

*Section 1983 Claims against the Individual Defendants in their Individual Capacities*

1. Qualified Immunity

With regard to the § 1983 claims against them in their personal capacities, the Individual Defendants claim qualified immunity. "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Thus, qualified immunity is available for officers who "act in objectively reasonable reliance on existing law." *Queen v. Prince George's Cty.*, 188 F. Supp. 3d 535, 541 (D. Md. 2016) (quoting *Rockwell v. Mayor & City Council of Baltimore*, No. RDB-13-3049, 2014 WL 949859, at *8 n.10 (D. Md. Mar. 11, 2014)). To determine whether qualified immunity is available to a law enforcement officer under § 1983, the Court "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "In particular, . . . qualified immunity protects law officers from 'bad guesses in gray areas' and it ensures that they may be held personally liable only 'for transgressing bright lines.'" *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

Pursuant to this doctrine, police officers are not liable under § 1983 unless "(1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right and (2) the right was 'clearly established' such that a reasonable person would have known his acts or omissions violated that right." *Streater v. Wilson*, 565 F. App'x 208, 210 (4th Cir. 2014)

(quoting *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011) (internal citations omitted)). The Court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in th[is] particular case at hand." *Pearson*, 555 U.S. at 236. The defendant carries the burden of proving qualified immunity. *McDonnell v. Hewitt–Angleberger*, No. WMN-11-3284, 2013 WL 4852308, at *3 (D. Md. Sept. 9, 2013) (quoting *Meyers v. Baltimore Cty., Md.*, 713 F.3d 723, 731 (4th Cir. 2013)).

Qualified immunity is more than "a mere defense; it is . . . 'an entitlement not to stand trial or face the other burdens of litigation.'" *Mazuz v. Maryland*, 442 F.3d 217, 232–33 (4th Cir. 2006) (quoting *Saucier v. Katz,* 533 U.S. 194, 200 (2001)), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). To ensure this entitlement, "the Supreme Court and [the Fourth Circuit] repeatedly have 'emphasized the importance of resolving the question of qualified immunity at the summary judgment stage rather than at trial.'" *Id.* (quoting *Wilson v. Kittoe,* 337 F.3d 392, 397 (4th Cir. 2003); citing *Saucier*, 533 U.S. at 200–01). Indeed,

> [w]hether an officer's conduct was objectively reasonable, and hence protected by qualified immunity, is a question of law solely for the court. Only disputed issues of fact material to the court's objective reasonableness decision are submitted to the jury. The court then uses the jury's factual findings, typically communicated in the form of answers to special interrogatories, to decide whether to grant qualified immunity.

*Id.* (citations omitted to *Willingham v. Crooke*, 412 F.3d 553, 559–60 (4th Cir. 2005); *Knussman v. Maryland*, 272 F.3d 625, 634 (4th Cir. 2001)).

Defendants combine their qualified immunity and failure to state a claim arguments, first defining qualified immunity; then contending: "As explained more fully herein, the facts alleged do not suggest that Defendants crossed any lines with Plaintiff, and therefore all claims should be dismissed against the Individual Defendants"; and then arguing that Defendants did not violate

Plaintiff's constitutional rights, such that, in their view, they are entitled to qualified immunity and Plaintiff failed to state a claim. *See* Defs.' Mem. 6–7. It is undisputed that the Individual Defendants, all of whom were police officers, were acting under color of state law. Thus, if Posyton has alleged facts that substantiate violations of his constitutional rights by Defendants, he sufficiently pleaded his claims to survive Defendants' dismissal motion on this ground. *See Peters*, 2016 WL 1239921, at *4. And, if those rights were clearly established, then in their individual capacities, Defendants are not entitled to qualified immunity.[9] *See Brockington*, 637 F.3d at 506; *Streater*, 565 F. App'x at 210. Accordingly, I will consider qualified immunity and failure to state a claim together for each claim.

### 2. Counts I, II, and III

Posyton claims that Naecker and Doe 1 violated his Fourth Amendment and Article 26 rights by briefly entering his dorm room and searching it, and he supports his allegations with his Verified Second Amended Complaint and Affidavit to Clarify. Second Am. Compl. ¶¶ 104–05, 111–12, 118–19. The Fourth Amendment prohibits "unreasonable searches," U.S. Const. Amend. IV, and "entry into [a suspect's] room constitutes a Fourth Amendment 'search,'" Mazuz v. Maryland, 442 F.3d 217, 226 (4th Cir. 2006), abrogated in part on other grounds as stated in Cole v. Buchanan Cty. Sch. Bd., 328 F. App'x 204, 207 (4th Cir. 2009). It is clearly established that warrantless searches "are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2452 (2015) (quoting *Arizona v. Gant,* 556 U.S. 332, 338 (2009) (quoting *Katz v.*

---

[9] I note that qualified immunity is only a defense to the § 1983 claims against the Individual Defendants, and not the state constitutional tort claims against the State. *See Littleton v. Swonger,* 502 F. App'x 271, 274 & n.2 (4th Cir. 2012); *Jones v. Chapman*, No. ELH-14-2627, 2017 WL 2472220, at *33 (D. Md. June 7, 2017); *Okwa v. Harper*, 757 A.2d 118, 140 (Md. 2000).

*United States,* 389 U.S. 347, 357 (1967))); *see also Kyllo v. United States,* 533 U.S. 27, 31–33 (2001); *United States v. Naughton*, 621 F. App'x 170, 174 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 1393 (2016). Therefore, "no reasonable officer can 'claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional.'" *Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 196 (4th Cir. 2015) (quoting *Groh v. Ramirez,* 540 U.S. 551, 564 (2004)).

"[W]hen the police enter private dwellings they must, with rare exceptions, come armed with a warrant. . . . Indeed, 'the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Wallace v. Poulos*, No. DKC-08-251, 2009 WL 3216622, at \*10 (D. Md. Sept. 29, 2009) (quoting *Payton v. New York,* 445 U.S. 573, 585 (1980)). Defendants rely on *Housley v. Holquist,* 879 F. Supp. 2d 472, 476-77 (D. Md. 2011), to support their argument that "officers [are] entitled to qualified immunity in [a] warrantless entry claim where a reasonable officer could have concluded they had probable cause to enter home," Defs.' Mem. 10. But, the *Housley* Court did not address warrantless entries in general, which, as discussed, are unconstitutional absent consent or exigency. *See Covey*, 777 F.3d at 196. Rather, the *Housley* Court addressed whether the officers' warrantless entry into the Housley residence, despite Mr. Housley's objection, and the seizure of Mrs. Housley to "return [her] to the hospital against her will" after an apparent suicide attempt "were justified by the mental health exception to the Fourth Amendment," which justifies "a *mental health* seizure" on "probable cause to believe that a person poses a danger to herself or others." *Housley*, 879 F. Supp. 2d at 480 (emphasis added). Defendants do not argue for the application of the mental health exception, or even contend that they had probable cause. And, while they make a fleeting reference to safety concerns, the approximately twelve hours that passed between the call to the police station

regarding Posyton snorting prescription medication and the officers' arrival at his dorm room belie their argument.

It is true, as Defendants argue, Defs.' Mem. 11, that "the Fourth Circuit has held that a government agent's act of 'opening [an] unlocked door and stepping inside, without a warrant [or other lawful authority] . . . was at worst a minor and technical invasion of [the resident's] rights.'" *Johnson v. City of Durham*, No. 09CV954, 2011 WL 4625730, at *6 (M.D.N.C. Sept. 30, 2011) (quoting *United States v. Seidman*, 156 F.3d 542, 547–49 (4th Cir. 1998)). In *Seidman*, a government informant "opened [Seidman's] unlocked door," and Seidman, who knew the informant, invited him in and conversed with him for forty-five minutes. 156 F.3d at 545. The Fourth Circuit "assume[d], without deciding, that [the informant's] entry into Seidman's home *was violative of the Fourth Amendment*," but "note[d] that the brief intrusion into Seidman's home was at worst a minor and technical invasion of Seidman's rights." *Id.* at 549 (emphasis added).

But it is also true that, "[i]n evaluating whether a Fourth Amendment violation occurred, the Supreme Court has taken into account the fact that the challenged government conduct 'could, at most, have only a de minimis impact on any protected property interest.'" *Johnson*, 2011 WL 4625730, at *6 (quoting *United States v. Jacobsen*, 466 U.S. 109, 125 (1984)). In *Jacobsen*, federal agents destroyed a small quantity of cocaine during a field test it conducted on a package that had been opened by the parcel carrier. 466 U.S. at 118–25. The Supreme Court held that, "because only a trace amount of material was involved, the loss of which appears to have gone unnoticed by respondents, and since the property had already been lawfully detained, the 'seizure' could, at most, have only a *de minimis* impact on any protected property interest,"

and it therefore "was reasonable." *Id.* at 125. Thus, any infringement on "any constitutionally protected privacy interest . . . was *de minimis* and constitutionally reasonable." *Id.* at 126.

But, significantly, after *Jacobsen* and the Fourth Circuit's *Seidman* opinion, the Supreme Court considered the use of thermal imaging to search a home and held that it was unconstitutional, reasoning that "the Fourth Amendment draws 'a firm line at the entrance to the house,'" and

> The Fourth Amendment's protection of the home has never been tied to measurement of the quality or quantity of information obtained. … [A]ny physical invasion of the structure of the home, "by even a fraction of an inch," [is] too much, and there is certainly no exception to the warrant requirement for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor.

*Kyllo v. United States*, 533 U.S. 27, 37, 40 (2001) (quoting *Payton v. United States*, 445 U.S. 573, 590 (1980); *Silverman v. United States*, 365 U.S. 505, 512 (1961)).

Accepting Posyton's allegations as true (as I must), Naecker asked to enter Posyton's room after Posyton had backed up and sat down, and Naecker took two steps into his room after having asked to enter but before Posyton responded; he then "immediately exit[ed]" when Posyton "yelled, 'No!'" Pl.'s Opp'n 2–3; Second Am. Compl. ¶¶ 25–29. Additionally, Doe 1 entered Posyton's room while Posyton went to his bathroom, accompanied by Naecker. Thus, here, unlike in *Jacobsen*, the violation was an intrusion into a home, rather than a seizure of property, and unlike in *Seidman*, Posyton did not invite the officers in for more than a brief trip to the bathroom for medication. Moreover, both of these are entries of more than an inch, which clearly are Fourth Amendment violations under *Kyllo*, unless an exception applies. *See Kyllo*, 533 U.S. at 37.

Defendants argue that an exception does apply: Posyton consented to their entry. Certainly, "a search conducted pursuant to a valid consent is constitutionally permissible" and "wholly valid." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (citing *Katz*, 389 U.S. at 358; *Vale v. Louisiana*, 399 U.S. 30, 35 (1970)). "Consent may be inferred from actions as well as words." *United States v. Hylton*, 349 F.3d 781, 786 (4th Cir. 2003).

Acknowledging that he later consented to Naecker's entry, Posyton argues that he did not consent to Naeker's initial entry or consent to Doe 1's entry. Defendants argue that Posyton, who had backed away from his door and sat down, consented to their entry through his actions. Defs.' Mem. 11. But taking Posyton's allegations as true (as is required at this stage of the proceeding), he had backed up before Naecker asked to enter, and he did not speak or gesture after Naecker asked to enter. Insofar as Naecker may testify otherwise, there is a dispute of material fact. Thus, on the record before me, I cannot conclude that Naecker is entitled to qualified immunity. Further, Posyton has alleged sufficiently that Naecker violated his Fourth Amendment rights by entering his dorm room to state claims against Naecker under § 1983 for unlawful entry, invasion of privacy, and unreasonable search.

As for Doe 1's entry, he entered after Posyton consented to entry. Posyton argues that he only consented to Naecker entering. Pl.'s Opp'n 4 ("Mr. Posyton solely invited Naecker into his home to accompany him strait [sic] to his bathroom. Mr. Posyton looked directly at Naecker and said, 'You can accompany me to the bathroom.'"). He relies on *Florida v. Jimeno*, in which the Supreme Court held that "[t]he scope of a search is generally defined by its expressed object," such that an individual may "place an[] explicit limitation on the scope of the search." 500 U.S. 248, 251 (1991). When an individual provides "general" consent, "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective'

reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* Although Defendants argue that the scope of consent only pertains to the area searched and not the officers permitted to enter, *see* Defs.' Mem. 11–12, they do not provide any authority in support of their argument. Defendants have not met their burden of proving that a reasonable person would have understood Posyton's statement to Naecker to permit Doe 1 to enter as well. Consequently, I cannot conclude that Doe 1 is entitled to qualified immunity either. Additionally, Posyton has alleged sufficiently that Doe 1 violated his Fourth Amendment rights by entering his dorm room to state claims against Doe 1 under § 1983 for unlawful entry, invasion of privacy, and unreasonable search. Defendants' motion is denied as to the claims against Naecker and Doe 1 in their individual capacities in Counts I, II, and III.

### 3. Count V

With regard to Does 3 and 4, Posyton claims in Count V that they violated his rights under the Fourteenth Amendment and Article 24 by failing to intervene when Naecker and Doe 1 entered his dorm room. The Fourteenth Amendment protects the right to be free from the deprivation "of life, liberty, or property, without due process of law."[10] U.S. Const. amend. XIV, § 1.

> A failure to intervene claim under § 1983 "is a theory of 'bystander liability' wherein there is 'an omission to act . . . coupled with a duty to act.' A 'bystander officer' could be liable for his or her nonfeasance if he or she: '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'"

---

[10] As noted, qualified immunity is only a defense to federal, and not state, constitutional claims. *See Littleton*, 502 F. App'x at 274 & n.2; *Jones*, 2017 WL 2472220, at *33; *Okwa*, 757 A.2d at 140.

*Dodson v. Prince George's Cty.*, No. JKS-13-2916, 2016 WL 67255, at *3 (D. Md. Jan. 6, 2016) (quoting *Randall v. Prince George's Cty.*, 302 F.3d 188, 202, 204 (4th Cir. 2002)).

Defendants do not show, or even argue, that they did not have a reasonable opportunity to prevent the harm or that they acted to stop the other officers; they simply argue that Does 3 and 4 are entitled to qualified immunity because, in their view, neither Naecker nor Doe 1 violated a clearly established constitutional right, such that there was no duty to act. Defs.' Mem. 13. But, because they failed to show that Naecker and Doe 1 did not violate any clearly established constitutional rights, I cannot conclude on the record before me that Does 3 and 4 had no duty to stop their fellow officers. Therefore, they are not entitled to qualified immunity on Count V. And, Posyton has alleged that Does 3 and 4 knew that Naecker and Doe 1 were violating his constitutional rights, had a reasonable opportunity to stop them, and chose not to, so as to withstand Defendants' motion to dismiss Count V with regard to Does 3 and 4 in their individual capacities.

### 4. Count VI

In Count VI, Posyton alleges that Defendants Mable, Thomas, and Doe 2 violated his rights under the Fourth Amendment of the U.S. Constitution and Article 24 of the Maryland Declaration of Rights by bringing him to UMPD headquarters, which he views as an unreasonable seizure. *See* Second Am. Compl. ¶¶ 134–44. The Fourth Amendment secures the right to be free from "unreasonable . . . seizures." U.S. Const. Amend. IV. But, the Fourth Amendment "does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno,* 500 U.S. 248, 250 (1991); *see also Whren v. United States,* 517 U.S. 806, 809–10 (1996). Thus, the Court must consider whether the seizure

was objectively reasonable.  *See Los Angeles County v. Rettele,* 550 U.S. 609, 614 (2007); *Graham v. Connor,* 490 U.S. 386, 397 (1989).

Defendants do not address the reasonableness of the seizure; instead, they hinge their argument on their insistence that there simply was no seizure at all.  *See* Defs.' Mem. 13–15. Certainly,

> [a] seizure implicating the Fourth Amendment does not occur simply because a police officer approaches an individual and asks a few questions. . . . Rather, such a seizure occurs when a police officer terminates or restrains a [person's] freedom of movement and, in view of the totality of the circumstances surrounding the stop, a reasonable person would not feel free to leave or otherwise terminate the encounter.

*Hodge v. Stephens*, No. 12-1988-AW, 2013 WL 398870, at *8 (D. Md. Jan. 31, 2013) (quoting *United States v. Watkins,* 378 F. App'x 328, 329 (4th Cir. 2010)), *aff'd,* 533 F. App'x 344 (4th Cir. 2013); *see also United States v. Mendenhall,* 446 U.S. 544, 554 (1980) ("[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.").

> "[C]ircumstances that might indicate a seizure . . . [include] the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." [*Mendenhall,* 446 U.S. at 554] (citation omitted). In sum, the seizure of a person "requires *either* physical force ... *or,* where that is absent, *submission* to the assertion of authority." *California v. Hodari D.,* 499 U.S. 621, 626 (1991) (emphasis in original).

*Kangalee v. Baltimore City Police Dep't*, No. RDB-12-01566, 2012 WL 5457231, at *5 (D. Md. Nov. 7, 2012).

Here, there were three officers—Thomas, Mable, and Doe 2—who went to Posyton's dorm room and asked him to go to the police station. Second Am. Compl. ¶ 44. Although

Posyton alleges that the officers were armed, he does not allege that the weapons were drawn or even visible, and he states that they were not in uniform. *Id.* ¶¶ 44–48. He does not claim that any of the officers touched him or said anything more than "We'd like you to come down to the station for questioning." *Id.* ¶¶ 44, 47. These facts weigh against a conclusion that a seizure occurred. *See Mendenhall*, 446 U.S. at 555; *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997).

Yet, Posyton also alleges that Officer Mable "began to crouch down, and placed his hand over MR. POSYTON's doorframe to prevent MR. POSYTON from closing the door." Second Am. Compl. ¶ 48. "[P]hysically block[ing]" a suspect's "departure, effectively seiz[es] the individual[]." *United States v. Decator*, 131 F.3d 137, 1997 WL 770609, at *13 (4th Cir. 1997) (Table). Thus, while Posyton's allegation that he was seized may have little support, I cannot conclude as a matter of law that Defendants did not seize him, when the undisputed evidence shows that three officers stood in his doorway, and one prevented the door from closing, such that Posyton effectively was unable to end the encounter. *See id.* Consequently, Defendants are not entitled to qualified immunity on this claim. Further, Posyton has allegedly sufficiently that he was seized to withstand Defendants' challenge to his pleading of this claim against Thomas, Mable, and Doe 2 in their individual capacities.

### 5.  Count VII

Finally, Posyton claims in Count VII that Thomas, Mable and Doe 2 violated his rights under the Fourteenth Amendment and Article 24 by questioning him for three and a half hours in an interrogation room. The Fourteenth Amendment makes the Fourth Amendment and its provision against unreasonable seizures applicable to the States. *See Mapp v. Ohio*, 367 U.S. 643, 650–51 (1961). The Fourth Circuit has concluded that, when a suspect is "taken from a . . .

home to a police car, transported to a police station, and placed in an interrogation room" without being "informed that he was 'free to go,'" the seizure is not reasonable under the Fourth Amendment if not based on probable cause. *See Moore v. Ballone*, 658 F.2d 218, 226 (4th Cir. 1981). These are the circumstances alleged in this case, and Defendants do not contend that they had probable cause.[11] Accordingly, Defendants are not entitled to qualified immunity on this claim. *See id.* Moreover, Posyton has stated a claim in Count VII.

## Conclusion

In sum, Posyton cannot state a claim against the Individual Defendants in their official capacities, UMCP, or the State under § 1983, and those claims will be dismissed. And, sovereign immunity bars Posyton's state constitutional tort claims against the Individual Defendants; those claims also will be dismissed. Defendants failed to show that they are entitled to qualified immunity on Posyton's § 1983 claims against the Individual Defendants, or that Eleventh Amendment immunity bars Posyton's state constitutional tort claims against the State, however. Moreover, Plaintiff's state constitutional tort claims against the State and his § 1983 claims against the Individual Defendants are sufficient to withstand Defendants' motion to dismiss or for summary judgment. The State's liability for each of the two alleged incidents may not exceed $400,000. *See* State Gov't § 12-104(a)(2).

The following chart shows the claims that remain and the claims that have been dismissed:

---

[11] Defendants do argue that the interrogation was "legally justified, as it was focused on a reported assault of another student, and for which Plaintiff was questioned about his involvement." Defs.' Mem. 8. But, neither legal justification for questioning short of arrest, nor the fact that another student was assaulted is tantamount to probable cause to believe that *Posyton* had committed a crime, as is necessary for a warrantless arrest under the Fourth Amendment. *See McAfee v. Boczar*, 738 F.3d 81, 87 (4th Cir. 2013).

| *Remaining claims* | *Dismissed claims* |
|---|---|
| Count I (invasion of privacy)<br><br>• Fourth Amendment claim, pursuant to § 1983 (against Naecker and Doe 1 in their individual capacities)<br>• Article 26 claim (against State of Maryland) | Count I (invasion of privacy)<br><br>• Fourth Amendment claim, pursuant to § 1983 (against State of Maryland)<br>• Article 26 claim (against Naecker and Doe 1 in their individual capacities) |
| Count II (unlawful entry)<br><br>• Fourth Amendment claim, pursuant to § 1983 (against Naecker and Doe 1 in their individual capacities)<br>• Article 26 claim (against State of Maryland) | Count II (unlawful entry)<br><br>• Fourth Amendment claim, pursuant to § 1983 (against State of Maryland)<br>• Article 26 claim (against Naecker and Doe 1 in their individual capacities) |
| Count III (unreasonable search)<br><br>• Fourth Amendment claim, pursuant to § 1983 (against Naecker and Doe 1 in their individual capacities)<br>• Article 26 claim (against State of Maryland) | Count III (unreasonable search)<br><br>• Fourth Amendment claim, pursuant to § 1983 (against State of Maryland)<br>• Article 26 claim (against Naecker and Doe 1 in their individual capacities) |
|  | Count IV (previously dismissed in its entirety by consent) |
| Count V (failure to intervene)<br><br>• Fourteenth Amendment claim, pursuant to § 1983 (against Does 3 and 4 in their individual capacities)<br>• Article 24 (against State of Maryland) | Count V (failure to intervene)<br><br>• Fourteenth Amendment claim, pursuant to § 1983 (against State of Maryland)<br>• Article 24 (against Does 3 and 4 in their individual capacities) |
| Count VI (unreasonable seizure)<br><br>• Fourth Amendment claim, pursuant to § 1983 (against Mable, Thomas, Doe 2 in their individual capacities)<br>• Article 26 (against State of Maryland) | Count VI (unreasonable seizure)<br><br>• Fourth Amendment claim, pursuant to § 1983 (against State of Maryland)<br>• Article 26 (against Mable, Thomas, Doe 2 in their individual capacities) |
| Count VII (unlawful custody)<br><br>• Fourteenth Amendment claim, pursuant to § 1983 (against Mable, Thomas, Doe 2 in their individual capacities)<br>• Article 24 (against State of Maryland) | Count VII (unlawful custody)<br><br>• Fourteenth Amendment claim, pursuant to § 1983 (against State of Maryland)<br>• Article 24 (against Mable, Thomas, Doe 2 in their individual capacities) |
|  | Counts VIII, IX, X (previously dismissed in their entirety by consent) |

This case will proceed to discovery with regard to the remaining claims, and I will appoint pro bono counsel for Posyton, for the limited purpose of advising him throughout the discovery period, without entering an appearance or representing him in this case. The appointed attorney will assist Posyton with understanding and complying with his discovery obligations under the Federal Rules of Civil Procedure, Local Rules of this Court, Appendix A to the Local Rules, and the Court's case management orders, e.g., ECF No. 9. The role of the attorney will be discussed further at the Rule 16 telephone conference that I will schedule.

A separate order will issue.

Dated: August 28, 2017                                    /S/
                                                 Paul W. Grimm
                                                 United States District Judge

lyb